Tax Matrix Technologies v. Wegmans Food Markets Mr. Rosenthal Good morning, your honors. May it please the court, Michael Rosenthal for Tax Matrix Technologies would like to reserve two minutes for rebuttal. Done. Your honors, in this case the district court abuses discretion in denying our motion for a new trial on damages for two reasons. First, the jury's verdict, when it was reverse engineered, bears no reasonable relationship to the evidence that was presented at the trial. And second, the district court permitted Wegmans to use a key exhibit, exhibit D7, as substantive evidence when in fact it was omitted only for impeachment purposes. Okay. Well, you know, the gist of the argument I'm hearing from the other side, in essence, I'm not doing this justice, is you guys made your bed, you ought to lie in it and be content to lie in it. That's sort of what the district court seemed to be saying to you. You went into your damages phase, you took a kind of an all or nothing position is how it's framed, and the jury didn't buy it. How is that different from any other jury verdict where somebody comes up short and doesn't like it? First of all, the jury is not relieved of its obligation to issue a verdict that is consistent with the weight of the evidence, and that's the focus of our case. In fact, if you look at the record evidence which is laid out in our brief, the weight of the evidence was that there was a starting point of $4.6 million for the assessment and an ending point of $256,000. The jury should have concluded from that first and the last that the... But you've got Stephen Feathers, your own witness, you've got Melissa Myers, your own witness, coming into court and saying, if I'm remembering right, if the state in the process of its audit came up with something and it was different, then that's not something the tax matrix would be entitled to recover for. The tax matrix, in fact, was not the body that said this reduction needs to be made, it was the state itself. Your Honor, the state issued its initial assessment of $4.6 million and it was replete with errors. The question is whether the fact that tax matrix may have identified a different set of errors and gotten to a result of $256,000 and took that path as opposed to they could have identified a different set of errors, that's not relevant. The state recognized certain errors and reduced the assessment. And how can tax matrix claim that it should be paid for the amount of reduction that, in fact, the state picked up the errors and fixed them and tax matrix did not even recognize that those errors were there. Your Honor, the record evidence is that we, in fact, did recognize errors by going through line by line of these items. And at the end of the day, that line by line review was what generated the reduction from $4.6 million all the way down to $256,000. To set the record, we were hired at that stage when there was a $4.6 million assessment that had already been issued. At that very moment, tax matrix's Melissa Myers, and this isn't laid out in the brief, actually called the state and said, hey, this is replete with errors. There are problems with it. The state on its own may have taken a second look at it right then and there and identified certain errors. But the fact is, Your Honor, if I may, the fact is that we were the catalyst for that entire process. Ms. Myers specifically testified that there were reductions from $4.6 to $2.1 to $1.8 that had to do with the state's restructuring of the developed error concept they used as well as arithmetical mistakes they made. She specifically testified that she didn't discover those and didn't make those corrections. Wasn't the jury entitled to rely on those what I consider to be admissions of non-achievement by tax matrix in formulating the verdict? No, Your Honor, and that's because that was simply a different path to achieving. If I may put it in that a little bit different context, a lawyer has a contingency arrangement on the fee. There are multiple ways that lawyer can achieve the final result, right? It could be a single phone call may generate a great result, or it could be years of litigation. You know, I don't find this line of argument particularly persuading if you want to go ahead. But I'm looking at a contract that tax matrix will receive a certain percentage of any reduction that they achieve. And when tax matrix employees testify that they didn't recognize certain errors and they were not the ones who got those errors out of the assessment, I think that it is perfectly free for the jury to consider that the fee that tax matrix gets should not include the reductions made by the state. But in this case, again, it's a distinction between recognizing different errors and it's a different pathway to achieving a great result for the client. And your argument depends upon our accepting your premise that, as the word you used, catalyst, that by merely making the phone call, they were entitled to whatever happened next, right? Because Myers herself says, I don't even know what that error was. I didn't even know that kind of error existed. She had nothing to do with that. Fetters says, you know, if we didn't do that, then we wouldn't be entitled to it. But your position here today is, as soon as they made the first phone call and said, we think there are problems with this, any reduction that occurred is attributable to tax matrix and they get the benefit of it on the contingency. Is that the argument? That is our argument, Your Honor. Well, that's an extraordinary argument, isn't it? That's a kind of a tough road to hoe when your own witnesses get on the stand and contradict that legal position by saying, if we didn't bring it to the attention of the authorities, we wouldn't be entitled to it. I thought that's what Fetters said straight out on her own. Your Honor, both Fetters and Fraunhofer said that. The distinction there, Your Honor, would be that, for example, if we were presented with $4.6 million, and it was just presented to us and we did not do any work on it, and we did not make a phone call, and then the next day... But one phone call was enough. In your view, one phone call was enough. Pick the phone up and say, God, we should look at that again. Score, $1.3 million. That's the position tax matrix has taken. Yes, Your Honor, because this is a contingency arrangement. This isn't based on necessarily the amount of work that may go into the production. Now, as the case went on, don't forget that the tax majors worked on this case, worked through this case for two years, right? And so they did substantial work. And the jury agreed with you. On the liability phase, you guys won. In fact, in the teeth of this Exhibit D7, which you have made a centerpiece of your briefing, the jury rejected the notion that there was no liability. So, on that exhibit, why isn't it harmless error? You won on liability. It wasn't harmless error, Your Honor, because that was the core of Wegman's case. The D7, they were able to argue that there were no assessments at all. They never mentioned that exhibit in the damages phase. Can you point us to anywhere where they said, hey, there's D7, that tells you you should give less in the way of money? Your Honor, as a practical matter, all of the evidence came in in one phase. It was simply a bifurcated argument. It wasn't a bifurcated trial in the sense that there was a separate body of evidence in the liability phase and then a separate body of evidence in the damages phase. This was all one core of evidence. That bill could not be unwrung. This was the heart of our objection. Was there an argument as to liability and a liability verdict? Correct, Your Honor. Then was there an argument presented to the jury about damages and then the damages verdict? Correct, Your Honor. Am I correct that when it came to the liability phase, they relied on D7 and they lost your opponents? Correct, Your Honor. Am I correct that when it came to the damages phase, they didn't talk about D7? That was not a feature in argument. Am I right as a historical matter about that? That's correct, Your Honor. Okay. But, Your Honor, D7 had played such an important role in their liability phase that it was something that infected the jury's decision-making going in because remnants had argued that there was nothing but preliminary findings. I mean, don't forget. My colleagues have pointed out that that argument was rejected. The jury found in your favor on that. Right. And here's getting back to why there should have been a new trial. Once the jury found in our favor that, in fact, there were assessments that, in fact... You could collect on reductions in the work papers. Correct. Isn't that what it would allow you to do? But they should have pointed to the first work set of work papers, which was the initial assessment. And that's not just our view of it. Raymond's view of it was that the $4.6 million was a starting point. And, again, that's laid out in our brief. There was admissions at trial, as well as in their internal memoranda and papers, that $4.6 million was a starting point. As Judge Jordan has pointed out, it seems that your own witnesses made it very clear that they knew they were not entitled to a fee for reductions that they didn't bring about. And the bulk of the reductions seemed to be Maryland auditor-generated, as opposed to tax matrix-generated. In fact, again, as we point out in the record, even in Raymond's own internal documents, they said that the majority of the reductions had to do with going through line by line and looking at which items were, in fact, taxable. Melissa Myers was tax matrix key person on that job. And I've read her testimony. I have it here. She's very candid in saying that she did not bring about those reductions from $4.6 to $2.1 to $1.8. I can't read it any other way. You can tell me that I should. I'm happy to listen. Your Honor, that's exactly what we're saying, is that she testified. She testified that when she got the $4.6 million, she was directed by Raymond's to reduce that number. She called the Maryland auditors. She said that she didn't think they were fair because they were trying to tax certain other locations in full. She called the supervisor, who, in fact, at one point did not want to send the auditors back in to take another look. Nobody's suggesting that she did nothing. She clearly did something. She did work. That's clear. I don't think anybody was taking the position that tax matrix did nothing. Let me ask you something, since you're about out of time, about the Rule 50, Rule 59 argument that we're getting from the other side. They made the argument that you didn't make your Rule 50 motion to close the evidence, so you defectively waived your motion for a new trial. And this seems to come down to a distinction between a sufficiency of the evidence outweighed the evidence argument. Why are they wrong? Why are you on the right side of that and able to advance this argument for a new trial? I think the case law in Garlock and Vargo are clear, Your Honor, that there are two paths to seek a new trial on this, that there is, in fact, if you do not seek a directed verdict or other judgment as a matter of law at trial, then you still have the opportunity under Rule 59 to seek a new trial based on the weight of the evidence. And, again, I think that that's very clear from the Third Circuit law, Your Honor. Okay. All right. Thank you, Mr. Rosenthal. We'll have you back on rebuttal. Mr. Heronine? Good morning, Your Honor. It's Jeffrey Heronine for Wegmans. Your Honors, have the argument. Can I get you to start where I ended with Mr. Rosenthal and ask you how can a plaintiff be put in a position to be held to be required to make a Rule 50 motion when the compensatory damages issue isn't fully worked out? Which was the case here, right? That's the case that we pressed, Your Honor. But at the trial level, the post-trial level, and even up through this appeal, tax makers' position has been, and I quote, the only reasonable parenthesis or even possible closed parenthesis conclusion is the full value. They're not entertaining anything short of that, and we heard that up to and including this argument. Can't that actually be – well, maybe I should put it this way. Do you have any case or authority for the position that if a party feels that the weight of the evidence hasn't been – that they deserve more money, it's a remitted to or added to circumstance, that they have to have made a Rule 50 motion? On a weight of the evidence challenge, no, Your Honor. But that's what the distinction is between weight and sufficiency. And that's what Vargo v. Coslett discusses. That's what the previous Third Circuit precedent discusses. When you're charging – Can't their side be viewed as doing that? Can't their side be viewed as saying, we deserve more? And so, you know, it's a weight of the evidence argument. Give us another shot. Well, our position is when you say there's only one conclusion based on a mechanical application of the contract to the jury's conclusion, that that is a sufficiency of the evidence charge. He's not arguing that the jury looked at all the evidence and weighed it in properly or gave credit to more than the others. As far as the tax matrix is concerned, once that liability finding came down, the answer should have fallen out of that. Why we needed a second argument, why we needed anything more, in their mind, Your Honor, not in Wegman's certainly, but in their mind, it was mechanical. We could have just gotten judgment at that point. Do you dispute that $4.6 million was the starting point for tax matrix work? $4.6 million was the first set of preliminary work papers that was received. The testimony that came in, and Your Honors are well familiar with it, I can tell from your questions to Mr. Rosenthal, was that the initial work papers were dropped by from 4.6 to 2.1 to 1.8 because of these arithmetical calculations. Somewhere between 2.1 and 1.8 is when Ms. Myers began doing her line-by-line analysis. She wasn't very clear in testimony as to when that began or what that specifically entailed, but the fact of the matter is the work that tax matrix is now relying on that Ms. Myers performed happened sometime between, it effectively worked out to be between Christmas and the end of January, I believe, if I remember the record correctly. Was the jury instructed that they should consider, were there special instructions for the jury concerning they could consider exactly what tax matrix had accomplished in order to reduce the amount of the assessment? I don't think, Your Honor, there were specific instructions on that point. What the jury did have was Mr. Feather's testimony that when, I'm sorry, tax matrix only gets paid for the work it does. I don't think there was any further instruction from Judge Regreno at charge or beforehand. It was up to tax matrix to live up to what Mr. Feathers had said, namely, to prove that their work begat certain reductions that they could then take their contingency fee on. And the argument that, the catalyst argument that appeared after the fact, after, frankly, the jury verdict was rendered, depends on the surmise that that one phone call that Judge Jordan was referring to before sparked all of this work. That was all that needed to be done. And there's no evidence in the record that that call had any connection to the arithmetical miscalculations that were caught and corrected by the state. Did Waidman's argue to the jury that in assessing damages, you should consider what reductions tax matrix actually accomplished by their work? Absolutely, Your Honor. Was there objection to that? No. No. And one easy way to clarify whether that call had any significance to this calculation at all would have been for tax matrix to call the appraiser, or the Maryland State Tax Auditor, pardon me, and to ask, why did you do that? Tax matrix made another tactical decision not to call that auditor because tax matrix was concerned the auditor would say, these work papers, they're not assessments, these are preliminary rough work papers. The assessment came at the end of the process. And if that had been the case, the entire case, there would have been a no cause. It would have been an unjust enrichment claim because the contract wouldn't apply. There was a tactical decision, just as there was to swing for the full value, to not bring this evidence in. So all you have is counsel's surmise that the call begat the correction when the correction wasn't even identified by tax matrix. Tax matrix argues that the jury plucked, to use this word, plucked the verdict out of thin air. Was there evidence to support the $351,000 award in tax matrix's favor? Yes, Your Honor. As I alluded to earlier, we've structured that in a chart, which I hope was more helpful than delivering it orally. But the way the reductions happened was they went from 4.6 on December 12th to 2.1 on December, I believe, 19th of 2011. And then about a month and a half later, they dropped again to 1.8. The testimony came out at trial that it was between that second and third iteration that Ms. Myers began her line-by-line analysis. There was some general talk about pulling out certain capital items that would drop the overall assessment. But that was the time period that that work began. When the jury concluded that tax matrix didn't get the full value because the largest and earliest reductions from that first set of preliminary work papers was not their doing, they had no further help from tax matrix as how to assess that. So they had to look at Ms. Myers' testimony and credit it as best they could where that work began and what is attributable to tax matrix. And if you look back from the 350 up to what the reduction that the jury would have found to get to that final contingency, that 1.6 falls right in that window between the second and third iterations, I believe. And so that's where the jury came out. The jury concluded that that's where the reductive work began. And that's why, presumably, having not been in the room to listen, we have the $350,000. It's clear they didn't credit this idea that tax matrix was responsible for the largest reductions that happened in December and early January. The final assessment by Marilyn was $255,000. The record seems to be rather sparse on how that came about. Is there evidence in the record as to how that final assessment was arrived at? Very generally, Ms. Myers testified that she went through the work papers, which I believe your honors have a copy in the record. It's a couple of face sheets followed by a long run of data. And she went through and looked through opportunities for events that had been labeled, at least preliminarily taxable, that weren't in fact taxable under Marilyn law and advocated for those to be removed. Let me ask you, if I might, about Exhibit D7. We've heard a lot about it. There's a contention on your part that tax matrix waived its objection to the introduction of D7, the e-mail, to Mr. Espenshade from Mr. Frownfelter. The tax matrix waived that by a failure to object to its introduction as substantive evidence. Is that your position? Our position was they didn't object to its presentation to the jury. And then there was no objection made at the time of closing. The objection initially wasn't there to your use for impeachment purposes. There was a motion to eliminate. And that was granted. However, Judge Rubino, as he has a right, reversed his decision on that. And once Frownfelter testified, his contention with Judge Rubino's view was that he had opened the door to the use of that document for impeachment purposes, correct? That's right. As soon as Mr. Frownfelter testified inconsistently with the e-mail, that's when it was removed. But somehow it goes from being simply for use for impeachment to substantive evidence, which seems to be a bone of contention, at least from the perspective of tax matrix. Well, our position has always been that D7 should have never been excluded in the first place. It was a very neat error. And we provided the court with the authority from both the Superior Court and the Third Circuit as to why an admission by one of the parties who negotiated the contract, that the contract doesn't apply to the work. Where was it admitted for substantive evidence? My review of the record shows that after you prevailed upon Judge Rubino to allow it to be used for impeachment purposes, before any additional testimony was elicited from Mr. Frownfelter, that you asked that the document be kept on the screen so as not to be shown to the jury. And then once Mr. Frownfelter identified the document, Judge Rubino said, it may be shown, shall it? Yes. Is that the publishing of the jury that's at issue here? Well, that was when it was published. I don't know if it's an issue. I think from the perspective of tax gain. Well, I think what tax matrix is concerned is is how it was used in closing by my colleague on the liability phase. And it was referred to substantively at that point. By that point, Judge Marino. That's true. But let me reorient because I'm very interested in your answer to this question. At what point are you saying there was a waiver? Are you saying that they don't have a position to make here? Because when you said, let's publish it to the jury, at that point they should have stood up and said, no, no, the jury can't ever see that because it's only for impeachment? I mean, is that your legal position? How do you get to they waive their rights? What's the point in time at which you assert somebody should have stood up in the courtroom and said, stop? Well, Judge Jordan, to the extent that the claim of error is it shouldn't have been shown to the jury, it was at that point. If the argument is that. I'm trying to find out what your argument is, right? I'm trying to inquire and I'm assuming, but I shouldn't put words in his mouth, that Judge Marino was trying to inquire. You've made a waiver argument. Identify for us in the record where you think they waived, where you think they should have done something and didn't. Because up until now, Judge Marino has walked you through very carefully the historical facts. And somehow we get from its impeachment to its substantive evidence when it comes to closing. And your position now is there's waiver. I'm trying to figure out what the place is in the record where you think that's a waiver. The only place there could be a waiver, Your Honor, is at the time of publishing. All right. After that point, we had colloquy before closing where this was hashed out and where Judge Marino clarified or revisited whatever word we should use. The decision based upon what he had heard at trial. Thank you. Your Honor, if there's no further questions, it's always good to come back to the house where I started an increasing number of years ago. Thank you for your time. All right. Thank you. And Mr. Rosenthal, we'll have you back for a vote, sir. Really just two points, Your Honor. On the issue of calling the auditors, it was actually the auditors who were scheduled to be witnesses for Wegmans. They could have called the auditors to explain all of their work that they did. So the evidence in the record actually was simply was that Melissa Myers looked at these documents and realized that there were significant errors on them, made those phone calls, and we think the catalyst argument still stands. Secondly, on the issue of coming back to the issue of D7, the fact that it was shown to the jury during impeachment to allow the jury the opportunity to follow along does not mean that we waived our argument that, in fact, it should not have been admitted as substantive evidence. And when we got to the point at Shouldn't you have objected at that point, though? Shouldn't you have said once the document was placed on the screen, counsel for Wegmans indicated that it should be kept there and not shown to the jury, and then it was. And wasn't there a point at which you should have said, We don't want this shown to the jury because it's not substantive evidence, it's purely for impeachment purposes? Well, we made that argument during closing, Your Honor, and at the time being shown to the jury, the fact that it was shown to the jury to allow them to follow along with the testimony, I don't think waives our right to exclude that evidence for substantive purposes, especially when the judge had specifically said at sidebar that it was admitted for impeachment purposes only. Although later on he made it clear that once your witness, Mr. Froth, felt there was question about it, the door having been opened, he thought it came in for substantive purposes as well, that he not under Rule 613? I interpreted his understanding differently, Your Honor. I understood what he was saying was that either Wegmans itself had opened the door or Tax Matrix had opened the door to permit that document to be used for impeachment purposes. I think what happened was that the judge, who I thought did a great job during the trial, but in this one instance just misremembered what had happened with that evidence. He could have listened to the audio. He chose not to listen to the audio. And it was clear from the audio from the concrete it should have been impeachment only. We showed that to the court during our motion for the new trial. The court chose to deny it based on the record. Nevertheless, it was plain at that time that the court had in fact admitted for impeachment only. Thank you, Your Honor. Okay. Thank you, Mr. Rosenthal. Thank you. We thank both parties for the argument. Mr. Harding and Ms. Rosenthal, we've kept the matter under advisement. Thank you.